IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Magistrate Judge Boyd N. Boland

Civil Action No. 09-cv-00041-WDM-BNB

COPIC INSURANCE COMPANY,

Plaintiff,

v.

WELLS FARGO BANK, N.A.,

Defendant.
_____

**ORDER**
_____

This matter arises on the following discovery motions:

(1)     **Plaintiff's Motion for a Protective Order Regarding the Depositions of Neil Stone and Thomas Richards** [Doc. # 170, filed 3/22/2010] (the "Motion for Protective Order"); and

(2)     **Plaintiff's Motion to Compel Deposition Testimony** [Doc. # 187, filed 4/5/2010] (the "Motion to Compel").

The Motion for Protective Order is DENIED. The Motion to Compel is GRANTED.

At issue in this case are losses claimed by COPIC in connection with its participation in the Wells Fargo securities lending program. I have previously characterized the securities lending program as "a complicated and unique investment." Order [Doc. # 175, filed 3/24/2010] (the "March 24 Order") at p. 4. In general, Wells Fargo served as a custodian for COPIC's securities portfolio. Wells Fargo charged COPIC a fee for those services. The Wells Fargo securities lending program was designed to provide institutional clients with the opportunity to

increase portfolio return and offset custody fees. The securities lending program was designed to earn a "nominally extra return," Amended Complaint [Doc. # 18] at ¶22, to pay the custody fees in the following manner:

> There are two main categories of investments involved in securities lending.
>
> a. Investor's securities: The first type of investment is the investor's own securities portfolios. The bank (or other financial institution) [here, Wells Fargo] that sponsors the securities lending program keeps its investor-clients' portfolios [here, COPIC] in custodial accounts and lends these securities to brokers, who need temporary use of the securities to support their trading activities.
>
> b. Collateral investments: The second type of investment is made with the collateral that the bank (or other financial institution) receives from the brokers who borrow the securities. To protect the investors in case the brokers default and do not return the securities, the bank receives collateral, generally cash, from the brokers. To underscore the conservative nature of securities lending, the brokers must typically provide cash collateral that is worth more than the securities they borrow (in Wells Fargo's case, 102% to 105% of the value). The bank then invests this collateral until the securities are returned (when the securities are returned, the bank returns the cash collateral to the broker). Because the loan of securities is temporary, and because the bank must sell the collateral investment to re-pay the brokers in cash when the securities are returned, the collateral investments must be safe and liquid.

Id. at ¶24 (internal footnote omitted). Earnings from the "collateral investments" were intended to pay the custodian fees charged by Wells Fargo.

Here, it is alleged that the Wells Fargo securities lending program incurred losses, rather than a nominally extra return:

> Upon information and belief, under pressure from management to increase yields, Wells Fargo breached its promises and began investing the Collateral in highly risky and illiquid securities, such as Structured Investment Vehicles, mortgages and asset based

2

> securities, collateralized mortgage securities and their derivatives. In doing so Wells Fargo pursued its selfish and conflicting interest in maximizing its own return from the Collateral, which derived from the fact that Wells Fargo was entitled to 40% of the yield earned from investing the Collateral. The imprudent investments significantly increased the risk profile of the portfolio and severely impaired its value and liquidity.
>
> When COPIC tried to terminate its participation in the Program, Wells Fargo told COPIC that it could not do so, in spite of COPIC's unquestioned right to exit the Program. Wells Fargo told COPIC that there were unrealized losses in the investment portfolio, which rendered it insufficient to return Collateral as securities came off lending. Although there was sufficient value and liquidity in the Collateral Investment Account to liquidate COPIC's position, Wells Fargo nevertheless refused to do so, citing the "unfairness" to other participants if COPIC were allowed to escape.

Id. at ¶¶6 and 11. As a result, COPIC alleges losses of $45 million. Id. at ¶12.

The parties have had repeated disputes concerning the scope of discovery. The motions at issue here are the fourth and fifth to address the question. See Plaintiff's Motion to Compel [Doc. # 78, filed 2/2/2010]; Defendants Motion to Compel [Doc. # 82, filed 2/12/2010]; and Plaintiff's Motion for Protective Order That, With Limited Exception, Depositions of Morgan Stanley and Nuveen No Be Had [Doc. # 118, filed 3/1/2010]. The district judge recently upheld my rulings on some of these motions, including particularly my order defining the scope of permitted discovery. Order [Doc. # 214, filed 4/22/2010] (stating "[t]hat plaintiff may have had other more risky investments is irrelevant to what its expectations were with respect to the Wells Fargo program and whether Wells Fargo adhered to appropriate guidelines. Magistrate [Judge] Boland did not err in so concluding").

In my most recent order addressing the scope of permissible discovery, which is not subject to any objection, I ruled:

> In this case, I find that information concerning investments entirely unrelated to the Wells Fargo securities lending program is not relevant to any matter in dispute, nor is it reasonably calculated to lead to the discovery of admissible evidence. That unrelated, irrelevant discovery shall not be had.
>
> The lack of relevance is obvious. An investor may select a conservative, highly liquid investment vehicle to invest cash safely and securely for a short period of time--for example, until the money is needed for a closing on a house. The same investor may select more speculative long-term investments in connection with a retirement account because the speculative investments have a potential for greater return. The same investor may select an array of other investments for a variety of purposes, e.g., holiday funds, vacation-of-a-lifetime funds, college funds, etc. Information about how and why the investor chose one investment for one purpose and how that investment performed is not relevant to the investor's selection, and the performance of, an entirely unrelated investment made for a different purpose.
>
> \* \* \*
>
> Without some evidence establishing that the Wells Fargo securities lending program, on the one hand, and [other] investments, on the other hand, were for the same purposes or generally tied to the same performance criteria or mandate, it cannot be said that one is relevant to the other.

Order [Doc. # 175, filed 3/24/2010] at pp. 5-7.

The March 24 Order is as clear a statement of the scope of permissible discovery as can be made.

### 1. The Motion for Protective Order

The Motion for Protective Order [Doc. # 170] requests that I establish a limit on the areas of inquiry permitted in connection with two depositions, at their outset and before any questions have been posed. I will not attempt to do so. The most that can be said is that the depositions

should go forward subject to my previous orders defining the scope of permissible discovery, including particularly the March 24 Order. If inquiry is attempted beyond the scope of relevancy as I have defined it, the parties and/or non-party witnesses may invoke D.C.COLO.LCivR 30.3(A)(3)[1] as to any particular question or line of inquiry.

## 2. The Motion to Compel

In the Motion to Compel, COPIC seeks an order requiring Wells Fargo to produce a witness pursuant to a Rule 30(b)(6) deposition notice to testify about "[t]he securities or instruments that Wells Fargo purchased in any of its money market accounts." Motion to Compel [Doc. # 187] at p. 6. In particular, COPIC argues:

> COPIC believes, based on discovery obtained from Wells Fargo's Minnesota Action, that the Securities Lending Program's (the "Program") advisor, Wells Capital Management, bought and sold securities issued by Cheyne Finance for Wells Fargo's money market funds before those securities suffered losses, while the Program bought and held Cheyne securities that suffered losses. The information sought through Topic 8 will likely show that Wells Fargo, when acting on behalf of its money market funds, recognized problems with certain investments, including Cheyne, and directed its money market funds to sell those investments before suffering losses, contrary to its actions on behalf of the Program.

Id. at ¶5.

Wells Fargo resists the Motion to Compel, arguing that "COPIC seeks through Topic 8 testimony, not about the Business Trust, but rather, about investments made on behalf of 'money market accounts' that are separate and distinct from the Business Trust," and that this is "the

---

[1]Local rule 30.3(A)(3) allows a lawyer to instruct a witness not to answer a question when necessary to enforce a limitation on evidence directed by a judicial officer or as necessary to allow the lawyer to file a motion under Fed. R. Civ. P. 30(d)(3)(A) to terminate or limit the deposition examination.

5

same type of information COPIC successfully precluded Wells Fargo from obtaining with respect to COPIC's own investment managers and activities outside of the Business Trust." Opposition to Motion to Compel [Doc. # 206, filed 4/15/2010] (the "Opposition").  In addition, Wells Fargo notes that prior to entering into the Wells Fargo securities lending program COPIC was informed and agreed that:

> The investment decisions for the [securities lending program] Trust are made independently from those other accounts managed by Wells Fargo.  Wells Fargo shall be permitted to make an investment decision on behalf of the Trust which differs from decisions made for, or advice given to, such other accounts **even though the investment objectives of such accounts may be the same or similar to the investment objective of the Trust**.

Id. at p. 3.

In the March 24 Order, I noted that the information about separate investments could be relevant and discovery allowed where there was evidence that the investments "were for the same purposes or generally tied to the same performance criteria or mandate" as the Wells Fargo securities lending program.  Order [Doc. # 175] at p. 7.  COPIC has made such a showing here. In particular, COPIC has shown that Wells Fargo described the securities lending program in promotional materials as "similar to money market investments" and that the securities lending program "focuses on 2a-7-type money market securities. . . ."  Motion to Compel, Exh. C [Doc. # 187-3] at pp.2, 4.  Consequently, investments made in money market funds managed by Wells Fargo were generally tied to the same performance criteria or mandate as were investments in the securities investment program.  Information concerning investments by Wells Fargo managed money market funds is relevant to or reasonably calculated to lead to the discovery of admissible

evidence concerning investments made by Wells Fargo in connection with the securities investment program.[2]

IT IS ORDERED that the Motion for Protective Order is DENIED.

IT IS FURTHER ORDERED that the Motion to Compel is GRANTED. Wells Fargo shall produce a witness to testify about the information identified in Topic 8 of COPIC's Rule 30(b)(6) deposition notice at a date and time as the parties may agree, but in no event later than **May 21, 2010**.

Dated April 23, 2010.

                                                  BY THE COURT:

                                                s/ Boyd N. Boland
                                                United States Magistrate Judge

---

[2]Similarly, in the March 24 Order I allowed Wells Fargo to inquire about "any other securities lending program in which COPIC participated," finding those programs to be "sufficiently similar investments that information concerning them either is relevant to issues in this case or is likely to lead to the discovery of admissible evidence." Order [Doc. # 175] at pp. 7-8.