IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Magistrate Judge Boyd N. Boland

Civil Action No. 09-cv-00041-WDM-BNB

COPIC INSURANCE COMPANY,

Plaintiff,

v.

WELLS FARGO BANK, N.A.,

Defendant.

___

**ORDER**
___

This matter arises on **Plaintiff's Revised Motion for Leave to Add a Prayer for Punitive Damages** [Doc. # 229, filed 5/17/2010] (the "Motion to Amend"). The Motion to Amend is GRANTED.

COPIC describes its relationship with the Wells Fargo Securities Lending Program (the "Securities Lending Program") as follows:

> Wells Fargo held COPIC's securities (including both equities and fixed-income securities) in a Wells Fargo custodial account. After COPIC expressed concern over Wells Fargo's custodial fees, Wells Fargo suggested that COPIC enter the Wells Fargo Securities Lending Program (the "Program") to earn a small amount of money that would help offset the custodial fees. Under the Program, Wells Fargo acted as COPIC's agent and made temporary loans of COPIC's securities to brokers. The brokers would borrow the securities to support their trading activities, such as short sales and options contracts. The brokers posted collateral (the "Collateral") worth at least 102% of the value of the loaned securities. Wells Fargo would invest the Collateral (the securities Wells Fargo purchased with the Collateral are referred to as the "Collateral Securities," which are distinguished from COPIC's securities that were leant to the brokers).

> The Collateral Wells Fargo received from lending COPIC's securities, as well as other Program participant's securities was placed in a Trust. Wells Fargo was the Trustee. . . .
>
> The Collateral Securities purchased with the Collateral were held in the Trust for COPIC's benefit. COPIC was issued shares in the Trust. The Trust was operated like a money market fund in that the shares issued to COPIC had a targeted net asset value ("NAV") of $10.00. However, if the Collateral Securities lost value, the NAV would fall below $10.00, which would cause losses to COPIC.
>
> The Collateral Securities lost hundreds of millions of dollars in value and consequently the Trust broke the buck. Due to the losses, Wells Fargo shut the Trust down in September 2008.
>
> \* \* \*
>
> To convince COPIC that it would not take undue risks when investing the Collateral, Wells Fargo stated that "the prime considerations for [investing the Collateral] shall be safety of principal and daily liquidity requirements. Wells Fargo represented that it would only invest the Collateral in "highly liquid, short duration instruments" such as "high-grade money market instruments" and "2a-7 type money market securities emphasizing safety of principal and liquidity."

Plaintiff's Revised Memorandum In Support of Its Motion for Leave to Add a Prayer for Punitive Damages [Doc. # 229-2] (the "Brief In Support") at pp.2-5 (internal citations and footnotes omitted).

COPIC seeks leave to amend its complaint to include a request for punitive damages. COPIC states, without contradiction, that both Colorado and Minnesota law may apply to the various claims it asserts. Id. at p. 7 n.4. Colorado and Minnesota law preclude a plaintiff from seeking punitive damages in an initial complaint. See section 13-21-102(1.5)(a), C.R.S.; Minn. Stats. 549.191 and 549.20. Instead, each state requires that punitive damages be sought by amendment upon a *prima facie* showing of a right to the award of punitive damages. The *prima facie* showing must establish that a defendant's "conduct creates a substantial risk of harm to

another and is purposefully performed with an awareness of the risk in disregard of the consequences." Tri-Aspen Const. Co. v. Johnson, 714 P.2d 484, 486 (Colo. 1986)(internal quotation and citation omitted); see Minn. Stats. 549.20 ("the acts of the defendant [must] show deliberate disregard for the rights or safety of others").

COPIC argues that it is entitled to seek punitive damages based on evidence that Wells Fargo: (1) consciously purchased and held Collateral Securities that were too risky for a principal preservation portfolio, and thus violated the investment mandate; (2) violated specific investment guidelines; and (3) purposely hid from COPIC the risks of which it was aware in order to keep COPIC in the Program. Brief In Support [Doc. # 229-2] at p. 9.

COPIC argues:

> Wells Fargo purchased three types of securities with the Collateral that lost hundreds of millions of dollars in value: (1) mortgage-backed securities; (2) SIV's [1] including Cheyne Finance LLC SIV ("Cheyne") and Stanfield Victoria Funding LLC SIV ("Stanfield"); and (3) bonds issued by Lehman Brothers. (The mortgage-backed securities and the SIV's are collectively referred to as the "Mortgage Related Securities"). Before these securities lost value, however, Wells Fargo was aware that these securities carried

---

[1]SIV stands for "structured investment vehicles" which COPIC describes as follow:

> SIV's issued short-term bonds and used the money raised from the bonds to invest in longer term securities, such as mortgage-backed securities. When the short-term bonds matured, the SIV's would issue new bonds to pay off the maturing short-term bonds. Thus, SIV's had liquidity risk (in addition to credit risk)--if the SIV's could not sell the new bonds they would default on the maturing bonds.

Brief In Support [Doc. # 229-2] at p. 4 n.1.

> significant risks that made them inappropriate for a portfolio
> designed to preserve principal.
>
> Wells Fargo consciously and deliberately ignored the warnings and
> continued to purchase and hold the Collateral Securities even after
> Wells Fargo knew and was warned that the securities were far too
> risky for a principal preservation portfolio. Wells Fargo willfully
> breached its fiduciary duty.

Id. at p. 10.

COPIC initially states that "[t]he mortgage-backed securities that Wells Fargo purchased were almost all backed by sub-prime mortgages" including "negative amortizing and no-documentation loans." Id. at p. 11. The assertions are not supported by any competent evidence. To the contrary, in support of these assertions COPIC cites to two spreadsheets--Exhs. 7 [Doc. # 229-9] and 8 [Doc. # 229-10]. The spreadsheets are difficult to read, are unauthenticated, and no affidavit is provided explaining how they should be read or their significance. The spreadsheets, standing alone, have no meaning and do not support COPIC's assertions.

By contrast, Wells Fargo has presented evidence in the form of the Affidavit of Roger Adams [Doc. # 250] (the "Adams Aff."). Mr. Adams is the principal portfolio manager for the Wells Fargo Trust for Securities Lending. Adams Aff. [Doc. # 250] at ¶3. Mr. Adams states:

> Contrary to COPIC's representation that almost all the mortgage
> backed securities that the Business Trust purchased were
> considered subprime, only two, at most--GSAMP 2005-SEA2 A1
> (CUSIP 362341TM1) and Household Home Equity Line (CUSIP
> 40430GAG5)--fit that description (and they are currently
> performing).

Id. at ¶27.

COPIC's most compelling argument in support of its request to amend to add a prayer for punitive damages is:

> [G]iven the problems in the mortgage market throughout 2006 and into 2007, Wells Fargo's failure to sell the Mortgage Related Securities prior to July 2007, when they could have been sold at or near par, evidenced a reckless or willful and wanton disregard for the risks that these securities posed and the harm that could arise from purchasing and/or holding these securities.

Brief In Support [Doc. # 229-2] at p. 16. The argument is supported by the expert witness report of Laurence Freed, which states:

> Prior to July 2007 there were unmistakable signs and warnings in the marketplace that the mortgage market was in free-fall. An investment manager would have recognized that the valuations of the following securities were linked to the mortgage market, and thus understood that the credit and liquidity risk of these securities had become too high to purchase or to remain within a program designed to preserve principal and maintain daily liquidity:
>
> [Identifying by cusip securities held by the Securities Lending Program]
>
> An investment manager managing these investments and charged with the mandate of principal preservation and daily liquidity, exercising even a scant of care, would have heeded the warning signals and have sold the direct exposure to mortgage backed securities in the 1st quarter of 2007 at the latest and the exposure to SIV's by July 2007 at the latest, at which times these securities could still have been sold at or near par. Wells Fargo knew or at a minimum should have known about these warning signals. Wells Fargo recklessly disregarded the warning signals and purposefully chose not to sell these securities at these times, but instead hid behind a simplistic and wholly inappropriate hold-to-maturity policy. In the face of unmistakable warnings in the marketplace that the risk of loss to these securities was increasing dramatically with no signs of plateauing, Wells Fargo's failure to sell these securities prior to the first quarter and July 2007 was at a minimum reckless disregard of the harm that could arise from buying and holding the securities. Further, I believe that Wells Fargo's decision to buy and hold these securities past July 2007 evidences

5

> a willful and wanton disregard for its duties and the harm that
> could arise from holding the securities. Wells Fargo consciously
> or intentionally disregarded the high degree of probability of injury
> to the rights or safety of COPIC.

Expert Report of Laurence Freed [Doc. # 229-8] (the "Freed Report") at p. 5 of 11.[2] The factual support for Mr. Freed's opinions are documented in the Freed Report. Id. at pp. 10-14 of 31.

Wells Fargo admits that through mid-August of 2007 it could have sold the asset-backed securities in the Securities Lending Program at or near par. Deposition of Roger Adams [Doc. # 229-5] (the "Adams' Depo.") at p. 181 lines 11-24.

Wells Fargo resists the Motion to Amend as untimely. It points to the Scheduling Order [Doc. # 41, filed 4/20/2009] which established a deadline of May 24, 2009, to join parties and amend pleadings. However, I explained to the parties at the scheduling conference that the deadline was intended to force known amendments to occur immediately; that upon a showing of good cause, an amendment could be sought later; and that in my opinion good cause may be shown where a party learns something new through discovery, private investigation, or otherwise. Record of Proceedings Before Boyd N. Boland, United States Magistrate Judge, April 9, 2009, at 8:25-8:26 a.m. COPIC alleges that it has recently learned of matters underlying its claim for punitive damages, Brief In Support [Doc. # 229-2] at pp. 2, 6-7, including the disclosure on March 22, 2010, of Mr. Freed's expert report detailing his findings of willful and wanton misconduct. Id. at p. 9. These circumstances constitute good cause to extend the deadline for COPIC to seek leave to amend to add a prayer for punitive damages. I find that COPIC has acted with reasonable diligence to uncover the facts underlying its claim for punitive

---

[2] Citations to the Freed Report are to the pages as assigned by the court's CM-ECF system.

damages and has acted promptly after those facts became evident to seek leave to amend.

Nor do I find that Wells Fargo will be prejudiced by allowing the amendment. COPIC's allegations of willful and wanton misconduct have been in the case since the filing of the Amended Complaint. Amended Complaint [Doc. # 18, filed 2/24/2009] at, <u>e.g.</u>, ¶¶10, 81-82, 85-87, 92-94, 97, 106, 111, 119, 122, 125, 133, 149, and 150.[3]

Wells Fargo claims that punitive damages are "not available for breach of a contract when the purported breach is not accompanied by an independent tort." Wells Fargo Bank, N.A.'s Opposition [Doc. # 248, filed 6/25/2010] (the "Opposition Brief") at p. 19. In this case, however, COPIC has pled the state law torts of breach of fiduciary duty and fraud, for which punitive damages may be appropriate.

In short, I find that the Motion to Amend is timely and that COPIC has established a *prima facie* case of willful and wanton misconduct which may entitle it to an award of punitive damages.

IT IS ORDERED that the Motion to Amend [Doc. # 229-2] is GRANTED and that paragraph 8 of COPIC's Prayer for Relief in its Amended Complaint and Jury Demand [Doc. # 18] is deemed to state the following:

> Award COPIC its above described compensatory damages, attorneys' fees and costs, injunctive relief and equitable relief, punitive and/or exemplary damages for Wells Fargo's willful and wanton conduct, and other remedies pursuant to Colorado statutes. . . .

---

[3]Wells Fargo argues that the late addition of a punitive damages claim causes prejudice because it made discovery decisions on the assumption that there would be no punitive damages claim. Wells Fargo Bank, N.A.'s Opposition [Doc. # 248, filed 6/25/2010] at p. 19. If necessary and on an appropriate motion, I will consider allowing additional discovery to cure any prejudice which Wells Fargo can establish.

Dated August 2, 2010.

BY THE COURT:

 s/ Boyd N. Boland
United States Magistrate Judge