IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Walker D. Miller

Civil Action No.   09-cv-00041-WDM-BNB

COPIC INSURANCE COMPANY,

      Plaintiff,

v.

WELLS FARGO BANK, N.A.,

      Defendant.

---

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

Miller, J.

      This case is before me on the Motion for Summary Judgment (ECF No. 293), filed by Defendant Wells Fargo Bank, N.A. ("Wells Fargo") and Plaintiff COPIC Insurance Company's ("COPIC") Motion for Partial Summary Judgment on Breach of Fiduciary Duty Claim (ECF No. 291).[1]  The motions are both opposed by the other party.  Upon review of the parties' filings, I conclude oral argument is not required.  For the reasons that follow, Wells Fargo's motion will be granted in part and denied in part and Plaintiff's motion will be denied.

---

[1] After the motions were fully briefed, COPIC filed a motion for leave to submit supplemental authority, which I granted.  Wells Fargo filed a motion to strike those materials, arguing that they are irrelevant to the issues at hand.  ECF No. 359.  I have reviewed the authorities submitted by COPIC and given them the weight I deem appropriate.  Accordingly, Wells Fargo's motion to strike will be denied.

<u>Background</u>[2]

This case arises out of an investment scheme sponsored by Wells Fargo whereby securities belonging to the Plaintiff were used for temporary loans to investors (the "Securities Lending Program" or "Program").  As security for the loan, the borrowers of the assets provided collateral, usually cash, to lenders such as Plaintiff.  The dispute here centers primarily on the investment of that collateral, and the administration of the Program by Defendant Wells Fargo.

Plaintiff COPIC is an insurance company that provides medical professional liability insurance to physicians, hospitals, and managed care plans.  It has an investment committee and uses various internal and external professionals to assist in the management of its assets and investments.  In 1999, Plaintiff signed a Custody Agreement with Wells Fargo's predecessor establishing custodial accounts for its equity and fixed income investments.  Exh. A-8 to Def.'s Mot. for Summ J., ECF No. 294-8.  In late 2000, Plaintiff expressed concern over the bank's custodial fees.  Plaintiff thereafter began participating in Wells Fargo's Securities Lending Program to earn a return to help offset the custodial fees.

1.      The Program and Relevant Agreements

Under the Program, Plaintiff's securities would be loaned to brokers (the borrowers), who posted collateral in an amount slightly above the value of the securities for the use of the securities.  Wells Fargo acted as the intermediary between the lenders and borrowers

---

[2]The facts set forth here are taken from the parties' briefs and attached exhibits and are undisputed or, where disputed, presented in the light most favorable to the non-moving party.

of the securities.  The lender, COPIC, and intermediary, Wells Fargo, earn a small profit from fees collected from the borrowers and investment of the collateral.  The value of the loaned securities was determined on a daily basis and the amount of collateral adjusted to maintain the proper ratio.

Plaintiff entered into a Securities Lending Agreement ("SLA") with Wells Fargo, executed January 1, 2001.  SLA, Exh. A-2 to Def.'s Mot. for Summ J., ECF No. 294-2. Under the SLA, Wells Fargo was appointed as an agent for Plaintiff to make available Plaintiff's securities to brokerage firms and other borrowers.  SLA, ¶ 1.  Wells Fargo was empowered to enter into lending agreements with the borrowers, which would be available to lenders upon request.  SLA, ¶ 2(a).  The loans were to be collateralized in the amount of 102% of the market value of the loaned security and accrued interest.  SLA, ¶ 2(d). Wells Fargo was further authorized to take possession of the collateral and to invest it in "repurchase agreements, master notes (VPN), U.S. treasuries and agencies, U.S. or Euro dollar certificates of deposit and time deposits, bankers acceptances, commercial paper, and other short term money market instruments," as well as mutual funds holding such securities.  SLA, ¶ 2(f).  "The prime considerations for the investment portfolio shall be safety of principal and liquidity requirements."  *Id.*

Income from the Program was generated by fees paid by the borrowers and by investment of the cash collateral; Wells Fargo would receive 40% of the net earnings and Plaintiff would receive 60%.  SLA, ¶ 7.  Lenders of the securities could request termination of any loan of securities for any reason at any time.  SLA, ¶ 4.  Upon termination, Wells Fargo was to return the collateral securing the loan and return the securities to the lender within a reasonable time.  *Id.* ("The Bank will return to the Borrower directly or through the

3

Clearing Organization the collateral securing the loan."). The SLA contains the following provisions regarding allocation of risks:

> Participant [Plaintiff] assumes all risk of loss arising out of Borrower defaults on return of lent securities, collateral deficiencies or collateral investment loss. . . . The Bank [Wells Fargo] assumes the risk of loss arising from negligent and fraudulent operation of its Securities Lending Program.

SLA, ¶ 8.

Pursuant to the lending agreements with the borrowers, signed by Wells Fargo as agent but not Plaintiff, the collateral had to be repaid in full as a condition of the return of the securities. *See, e.g.*, Master Securities Loan Agreement, Exh. A-28 to Def.'s Mot. for Summ J., ECF No. 294-21, ¶¶ 4.3, 6.2. Pursuant to the SLA, Wells Fargo sent out monthly newsletters to all participants with updates about the Program. SLA, ¶ 6 ("The Participant shall receive a detailed report monthly which shall include all loan activity, Borrowers to whom loans were made and income earned.").

As a vehicle for investing the collateral, Wells Fargo had created a trust called the Wells Fargo Trust for Securities Lending (the "Trust"), with itself as Trustee, "for the investment and reinvestment of money and other property contributed thereto by participants in the securities lending program administered by Trustee or its affiliates." October 24, 2000 Declaration of Trust, Exh. A-1 to Def.'s Mot. for Summ J., ECF No. 294-1, Recitals (a). The cash collateral from any participant's loaned securities became the property of the Trust and the participants became shareholders of the Trust. *Id.*, Sec. 2.5 ("No shareholder shall have any interest in specific property of the Trust . . . but each Shareholder shall have . . . a proportionate undivided beneficial interest in the assets of the Trust . . . represented by Shares."). The Trust was later split into three funds, or series, two

4

of which Plaintiff participated in, discussed further below.  The Trust is expressly intended to be exempt from registration under the Investment Company Act of 1940.  *Id.*, Recitals (b).

The Declaration of Trust contains several provisions relevant to this dispute.  A shareholder, "by virtue of having acquired a share, shall be held expressly to have agreed to be bound by the terms of this Declaration and to have become a party hereto." Declaration, Sec. 4.10.  The powers of the Trustee are set forth in detail, and include the "full power and authority to make any investments which it, in its sole discretion, deems proper to accomplish the purposes of the Trust, consistent with the investment objectives established by the Trustee . . . ." *Id.*, Sec. 3.1.  The Trustee is charged with determining the Net Asset Value ("NAV") of the shares on a regular basis.  *Id.*, Sec. 5.3.  To exit the Program, shareholders had the right to redeem their shares "at a redemption price per Share equal to their Net Asset Value."  *Id.*, Sec. 5.2.  The Trustee has discretion to suspend a shareholder's right of redemption for no more than seven days; in addition, payment of redemption price could be in cash "or may be wholly or partly in securities or other assets at the value of such securities or assets used in such determination of Net Asset Value."  *Id.*

The Declaration also contains a limitation of liability for the Trustee and others:

> All persons contracting with or having any claim against the Trust or a particular Series shall look only to the assets of the Trust or such Series, respectively, under such contract or claim; and neither the Trustee nor any of the Trust's officers, employees or agents, whether past, present or future (each a "Covered Person" and collectively the "Covered Persons"), shall be personally liable therefor.  No Covered Person shall be liable to the Trust or to any Shareholder for any loss, damage or claim incurred by reason of any act performed or omitted by

> such Covered Person in good faith on behalf of the Trust, or a Series thereof, and in a manner reasonably believed to be within the scope of authority conferred on such Covered Person by this Declaration, except that a Covered Person shall be liable for any loss, damage or claim incurred by reason of such Covered Person's bad faith, gross negligence, willful misconduct or reckless disregard of the duties involved in the conduct of his or her office.

Declaration, Sec. 8.1.

A letter dated June 1, 2001 from Wells Fargo to Plaintiff announces the use of the business trust format for investing the cash collateral.  Exh. A-9 to Def.'s Mot. for Summ J., ECF No. 294-9.  Plaintiff apparently began its involvement in the Trust by purchasing shares in the Enhanced Yield Fund (or "EY Fund"), one of the three Trust series.  A Confidential Memorandum for the EY Fund series dated May 31, 2001 is provided.  Exh. A-4 to Def.'s Mot. for Summ J., ECF No. 294-4.  It summarizes the operation of the Trust and of the offering in the EY Fund but expressly states that the Memorandum is "QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE DOCUMENTS THEMSELVES, INCLUDING THE DECLARATION OF TRUST."  *Id.*  It states that the initial offering price per share shall be ten dollars.  *Id.*, Part III at 1.  "Wells Fargo will seek to maintain a relatively stable value per Share, however, no assurance can be given that the Share price will in fact remain stable."[3]  *Id.*  Fund assets are to be valued each business day at their current market value.  *Id.* at 2.  Shareholders are entitled to redeem their interest in the fund; the Memorandum further provides that "[p]ayment for redeemed Shares will be made in cash within seven days after the redemption date."  *Id.*  The Memorandum also provides

---

[3]The share price appears to be the same as the NAV referenced in the Declaration of Trust.

limitations of liability, specifically, "Wells Fargo and other agents of the Trust shall have no liability to the Trust or the Shareholders for any act or omission, provided that such act or omission does not involve bad faith, willful misconduct, negligence or reckless disregard of its duties to the Trustee." *Id.* at 3.

Consistent with the SLA, the investment objectives for the EY Fund are set forth as having "prime considerations" of "safety of principal and daily liquidity requirements." EY Fund Confidential Memorandum, Part V, at 4. Portfolio guidelines permit the investment manager to invest fund assets in U.S. Treasury and government sponsored agency obligations, repurchase agreements, domestic and foreign bank obligations and bankers' acceptances, commercial paper and participations, mortgage-backed securities, mortgage pass-through securities, taxable municipal securities, asset-backed securities, and corporate notes, bonds, and debentures. *Id.* (b) at 4-5. The maximum dollar-weighted average maturity of the Trust's portfolio is to be 90 days and the maximum maturity of any security is to be five years. *Id.* (c) and (d) at 5. Investors are warned that share value could change and that the Trust is subject to credit risk and interest rate risk. *Id.*, Part VI at 6.

Plaintiff enrolled in a second Trust series, the Collateral Investment for Term Loans Trust ("CI Term Fund"), on or around April 8, 2006. Subscription Agreement, Exh. A-3 to Def.'s Mot. for Summ J., ECF No. 294-3. The Subscription Agreement for the CI Term Fund refers to a similar Confidential Memorandum and requires the subscriber to adopt, accept, and acknowledge that it is bound by the Declaration of Trust. *Id.*, ¶¶ 1-2. In subscribing to the CI Term Fund, Plaintiff represents that it is relying solely on the terms of the Subscription Agreement and Confidential Memorandum and other documents such

as the Declaration of Trust; Plaintiff further represents that it has made an independent investigation of the pertinent facts and has sufficient knowledge to evaluate the merits and risks of the investment.  *Id.*, ¶¶ 5(b), (c), and (e).

The Confidential Memorandum for the CI Term Fund contains the same provisions and disclosures as the EY Fund Confidential Memorandum.  Exh. A-5 to Def.'s Mot. for Summ J., ECF No. 294-5.  It again has a target value of ten dollars per share, which again is not guaranteed.  *Id.*, Part V at 4.  The portfolio for the CI Term Fund includes many of the same types of investments as the EY Fund, including mortgage-backed and asset-backed securities.  *Id.*, Part V, (b) at 5.  It also contains the same language concerning limitations of liability as the EY Fund Confidential Memorandum.  *Id.*, Part III at 3.

Plaintiff has provided additional marketing materials from Wells Fargo that contain representations about the investment profile for the collateral investments.  For example, an undated Wells Fargo document entitled "Securities Lending Q & A" states that the collateral investments "are similar to money market investments."  Exh. 5 to Plaintiff's Resp., ECF No. 323-5, at CIC 00397.  The document goes on to say that "[i]nvestment of cash collateral is made in accordance with individual clients' account guidelines and an investment policy that focuses on 2a-7-type[4] money market securities emphasizing safety of principal and liquidity."  *Id.*, at CIC 00399.

The Trust relied on information from two affiliates of Wells Fargo, Wells Capital Management ("Wells Capital") and Galliard Capital Management ("Galliard") in making

---

[4]This appears to refer to SEC Rule 2a-7, which "imposes on money market mutual funds certain portfolio credit quality standards and maturity limits."  MELANIE L. FEIN, SECURITIES ACTIVITIES OF BANKS § 11.04 Investment Management (2011).

investment decisions but in general acted independently of them.  Wells Capital maintained a list of issuers of securities that were approved for purchase.  The Trust had a general policy of holding securities to maturity unless there was a likelihood of a default.  *See, e.g.*, Sept. 16, 2008 Securities Lending Update, Exh. A-31 to Def.'s Mot. for Summ. J., ECF No. 294-23 (discussing the bankruptcy of Lehman Brothers and noting "we continue to implement our portfolio management strategy to hold securities until they mature in at par and reinvest newly-available cash only in short term instruments, ranging from overnight to 30 days in maturity.").

2.     The Financial Crisis and Losses in the Collateral Investments

Investments in the CI Term Fund and EY Fund declined in value in 2007-2008, primarily because of losses from three issuers of securities: Cheyne Finance LLC ("Cheyne"), Stanfield Victoria, Ltd. ("Stanfield"), and Lehman Brothers ("Lehman").  These issuers had exposure to the risks in the mortgage market, including subprime mortgages, and ultimately defaulted on their securities.  Plaintiff contends that the securities were inappropriate for the collateral investment portfolios because they carried too much inherent risk and there were ample warning signs that they should have been sold before the serious losses were incurred.

Cheyne was a London-based security issuer known in the financial industry as a Structured Investment Vehicle ("SIV").  The Trustee approved Cheyne securities for purchase in May 2006 after Wells Capital had reviewed Cheyne's financials and conducted other analyses; however, Wells Capital did not review the specific assets owned by Cheyne.  Because of the credit crisis in 2007, Cheyne's securities declined precipitously in value and it experienced an enforcement event under English law on October 17, 2007.

Plaintiff provides evidence that individuals within the Wells Fargo investment community were aware of the risks presented by Cheyne before the enforcement.  On July 10, 2007, Wells Capital placed a 32-day maturity restriction on Cheyne securities.  Exh. 18 to Plaintiff's Resp., ECF No. 323-18.  Wells Capital also caused its 2a-7 portfolios to sell their Cheyne securities.  The Securities Lending Program, however, did not sell Cheyne, allegedly because the Trustee believed that Cheyne would be acquired by another entity and it would be better to hold the securities to maturity.  Wells Fargo further notes that no SIV issuer had ever previously defaulted.  Cheyne was eventually restructured in July 2008 and has been paying shareholders since then, apparently reducing some of the losses to the portfolio.

Plaintiff also presents evidence of notes from a "Portfolio Management Committee Meeting," involving the principal managers of the Program, dated September 20, 2007. Exh. 13 to Plaintiff's Resp., ECF No. 323-13.  It states that Bob Smith, Senior Managing Director of the Securities Lending Program, presented the following information:

> * NAV problems are okay
>
> * SIV's have the potential for large problems: maturities are tough to roll b/c investors are shying away, liquidity issues, assets are tough to value
>
> * Everyone is not to discuss Cheyne outside the group
>
> * Main concern is client exit

*Id.*

Stanfield was another SIV approved for purchase by the Trustee since July 2006. After the enforcement of Cheyne, Wells Fargo contends that it, as Trustee, and Wells Capital reviewed the other securities issued by SIVs in the Trust portfolios and determined

none was a default risk.  January 7, 2008 Letter to Securities Lending Participants, Exh. A-46 to Def.'s Mot. for Summ. J., ECF No. 294-37 (identifying SIVs in collateral investment pools and providing analysis).  Plaintiff, however, presents evidence that Wells Capital sold off securities issued by SIVs from its more conservative portfolios from June to October 2007 at a minimal loss and contends that the Trust should have done the same in order to meet its goals of safety of principal and liquidity.  Wells Capital also specifically identified Stanfield as a issuer from whom no further purchases should be made in an email dated August 23, 2007.  Exh. 20 to Plaintiff's Resp., ECF No. 20.  Stanfield also went into restructuring in January 2008.

Lehman declared bankruptcy on September 15, 2008.  Again, Defendant contends that the Trustee in good faith believed that Lehman holdings would pay off at full maturity and that the collapse of Lehman was a complete surprise.  Defendant notes that Plaintiff was aware since 2007 that the Trust held Lehman securities[5] but did not raise any concerns; indeed, Plaintiff directly held Lehman stock in other investments and none of its investment advisors anticipated the Lehman bankruptcy.[6]  However, Plaintiff also presents evidence that Wells Capital had issued warnings about Lehman well before the bankruptcy. For example, in April 2008, Wells Capital placed Lehman on a 32-day maturity restriction and recommended that portfolio managers and clients sell Lehman securities.  Exh. 25 to Plaintiff's Resp., ECF No. 323-25.  Wells Capital also caused its 2a7 portfolios to sell any

_____

[5]Participants had electronic access to some of the investment information for the Trust and its investment series.

[6]Plaintiff argues its other holdings in Lehman are irrelevant because these were not investments with a primary goal of safety of principal and liquidity.

Lehman securities with more than 32 days left to maturity; these portfolios were divested of Lehman securities by June 2008, three months before the bankruptcy.  Exh. 24 to Plaintiff's Resp., ECF No. 323-24.  Plaintiff also presents evidence in the form of an expert report in which its expert opines that Galliard and Wells Fargo were aware of the problems in the housing market, the credit market, and the specific issues affecting the issuers that defaulted and that there was sufficient warning in the financial press about the risk in holding these securities.  Exhs. 8 & 9 to Plaintiff's Resp., ECF Nos. 323-8 & 323-9.

3.   <u>Plaintiff's Losses and Attempts to Exit the Program</u>

As a result of the credit crisis, problems in the mortgage markets, and the enforcement action involving Cheyne, the collateral securities lost value in September and October 2007, causing the NAV to fall below $10.00.  Plaintiff asserts that Wells Fargo did not disclose this to Plaintiff but rather continued to report that the NAV was $10.00.[7]  In addition, Wells Fargo permitted another participant to exit the program and redeem its shares for $10.00 per share, when the NAV at the time was in fact approximately $9.97.  Exh. 27 to Plaintiff's Resp., ECF No. 323-27.[8]  This caused a shortfall of approximately $6 million in the Trust.  Exh. 70 to Plaintiff's Resp., ECF No. 323-70.  Plaintiff alleges that other

---

[7]The evidence indicates that Wells Fargo began publishing the NAV for the two relevant funds in its statements after September 2007.  Exh. A-34 & A-35 to Def.'s Mot. for Summ. J., ECF Nos. 294-26, 294-27.

[8]It was apparently the Program's unwritten practice to permit participants to exit the program at $10/share as long as the NAV was within .5% of the target price.  Exh. 27 to Plaintiff's Resp., ECF No. 323-27; Exh. 70 to Plaintiff's Resp., ECF No. 323-70. After the NAV fell below $9.95, the Program began using a "floating" NAV, that is, the actual market value at the end of each day; participants withdrawing from the program thereafter would have to redeem their shares at actual value.  Exh. A-59 to Def.'s Mot. for Summ. J., ECF No. 294-47.

important information was not disclosed by Wells Fargo, including that in September 2007 a number of securities in the collateral securities portfolio had been removed from the Wells Capital approved list, but continued to be held by the Trust.  Exh.71 to Plaintiff's Resp., ECF No. 323-71.

Plaintiff was not advised until November 20, 2007 that the NAV had fallen to $9.95, which represented an unrealized loss to Plaintiff of $830,000.  Exh. A-59 to Def.'s Mot. for Summ. J., ECF No. 294-7.  Plaintiff contends that it wanted to exit the Program at that time, but that Wells Fargo made affirmative misrepresentations to keep it in the Program, including that the portfolio had little exposure to subprime mortgages[9] and that the problem was from a short-term lack of liquidity in the market, which would improve the following year.  These representations were allegedly made before and at a conference call between the parties on November 28, 2007.  Notes regarding the call, apparently written by a Wells Fargo participant, indicate that Wells Fargo representatives "were going to ask COPIC not to recall their loans at year end in a previous telephone conversation with Steve Wagner [Plaintiff's Director of Investments]."  Exh. A-33 to Def.'s Mot. for Summ J., ECF No. 294-25.  The notes go on to say that:

> Bob Smith [of the Securities Lending Program] discussed that the current market environment is unprecedented and how that specifically relates to liquidity pressures.  He explained, in turn, the pressure this has created within the Securities Lending

_____

[9]There is a factual dispute about how much exposure the collateral investments had to subprime mortgages.  In October 2007, Wells Capital did an analysis of the Program's portfolio using its surveillance product and identified a number of securities with subprime assets but others disagreed with that analysis.  Exh. 42 to Plaintiff's Resp., ECF No. 323-42; Ajay Mirza Dep., Exh. 43 to Plaintiff's Resp., ECF No. 323-43 at 86 (only two securities in portfolio had exposure to subprime market); Exh. 45 to Plaintiff's Resp., ECF No. 323-45.

Business Trust Collateral Pools.  He stated that the market disruptions are falling mostly on asset-backed securities and that there has been limited or no short-term financing availability particularly on structured investment vehicles such as Cheyne, a position we currently hold.

Bob explained the various reasons brokers add to liquidity stress on our securities lending program at year end, added to that fact a number of our insurance clients recall loans at year end.  While we normally plan for these events, this year's liquidity issues were unforseen.  We assured COPIC that our securities lending collateral investment funds continue to be managed within the high quality and short duration guidelines standards that we had always followed.

Both Roger [Adams, the principal portfolio manager with the Securities Lending Program] and Bob stressed that they anticipated that the markets will return to normal over time. Steve [Wagner, Plaintiff's Director of Investments] offered that he has already begun to see the spreads begin to narrow and agreed that we were experiencing an unusual market environment.   Roger mentioned that the actual weighted average maturity to final was 181 days now versus that 231 that we had stated in the letter.

We then discussed more specifics in regards to our position in Cheyne.  This SIV is currently being restructured and that Wells Fargo is actively pursuing a conclusion along with our legal team.   Roger said we they [sic] had actually had an opportunity to evaluate the underlying assets within the SIV and that in fact Cheyne had very little exposure to subprime mortgages, furthering the belief that we will see a positive conclusion to the restructuring.  Bob stated that overall he believes that the fixed income markets will return to normal over time and that our securities lending program remains sound.

Steve [Wagner] strongly agreed with the assessment . . . and [was in agreement with Roger Adams of Wells Fargo] on their predictions that we will see some improvement in the first quarter of 2008.

We asked COPIC to maintain their loan positions within the securities lending program over this year end. [Plaintiff's representatives] agreed that this made sense in light of the

current market situation and that they did not want to contribute
to further stress on liquidity within our securities lending pools.

\* \* \*

The meeting concluded on a positive note with all parties in
agreement of COPIC remaining in the securities lending
program at year end and Wells Fargo continuing to monitor
compliance with the statutory limitations.

Exh. A-33 to Def.'s Mot. for Summ J., ECF No. 294-25.  Plaintiff asserts that, in fact, the

portfolio was exposed to a higher risk than represented by Wells Fargo.  Indeed, an internal

email to a Wells Capital representative dated November 6, 2007 reports an analysis of the

collateral investments and notes, "[b]ased on our credit model Sec Lending portfolio is

exposed to a much higher default risk than any 2a7 fund we manage."  Exh. 74 to Plaintiff's

Resp., ECF No. 323-74.

Shortly after the meeting with Plaintiff, on or around November 30, 2007,

representatives of Wells Capital met with representatives of the Securities Lending

Program.  Exh. 71 to Plaintiff's Resp., ECF No. 323-72.  In an email summarizing the

meeting, David Sylvester of Wells Capital identifies a number of concerns with the Program

and the two Trust series in which Plaintiff was invested.  *Id.*  First, Mr. Sylvester notes that

because of an accounting standard used by the Program "I am not sure that anyone really

knows what the book losses are in these portfolios yet . . . I just worry that the deviation

and true losses might be much bigger than we know at this point."  *Id.*  He further notes

concerns that much of the "paper" in the CI Term Fund is "under water . . . so what

happens if the clients pull out?  How do the assets get funded?  This is exactly what

happened to the SIVs, except there is no third party liquidity support . . . they have the NAV

at 99.31.  I'd bet it's lower."  *Id.*  He estimates that it would take a significant investment of

15

resources and risk management expertise to work out the problems with the Program.  *Id.*
Another internal Wells Fargo email from January 16, 2008 also reflects worries about the
Program, noting that the Program's managers "have funded long term assets with short
term liabilities and the funding is going away [. . .] As more and more clients reduce their
securities lending activity the worse the problem becomes."  Exh. 68 to Plaintiff's Resp.,
ECF No. 323-68.

In December 2007, the Program implemented new exit procedures.  First, the Trust
would place the client's pro rata share of the underlying collateral securities in the series
in a segregated account.  At that point, the participant could purchase those shares outright
at par value, and the proceeds would be used to obtain a return of the loaned securities,
or it could liquidate the securities and add in any shortfall to obtain the return of the loaned
securities, or it could manage the securities in its own account as it wished.[10]  Exh. A-29
to Def.'s Mot. for Summ J., ECF No. 294-8, ¶ 75.

Notes from a January 17, 2008 strategy session at the Program reflect that Wells
Fargo was worried about clients possibly leaving the Program.  Exh. 28 to Plaintiff's Resp.,
ECF No. 232-28.  Item #6 entitled "Hostage Clients" asks, "How long can we expect clients
to cooperate and 'stay the course' as advised by management?"  *Id.*  Item #7 entitled
"Floating NAVs" asks "When will we 'snap back' to $10?  Why? (Or why not?).  Will many
clients exit at that point, creating further pricing pressures on the remainder of the pool and
remaining clients?"  *Id.*

Additional indications that the Program was raising concerns at Wells Fargo are

_____

[10]Plaintiff was informed of these procedures in an email dated June 11, 2008.
Exh. A-68 to Def.'s Mot. for Summ. J., ECF No. 293-20.

shown in a "Proposal for Product Redeployment, Wells Fargo Securities Lending," dated March 4, 2008.  Exh. 35 to Plaintiff's Resp., ECF No. 323-25.  It notes that the current Program "has been deployed to the client base in a manner that is not sustainable or as well controlled as is now deemed appropriate in today's market and regulatory environment."  *Id.*  Among the issues identified are that clients believe "that the product is a risk free investment product," that the commingled investment approach means that one client's action can harm other participants, and that the "product interdependence with the custodial/trust product offering with relationship pricing which may fail to address the true cost or risk parameters."  *Id.*  The proposal suggests that the Program be converted to "individually managed accounts with a 2a-7-like investment guideline (maturity at or inside 13 months only)," as well as other changes.  *Id.*  In late January 2008, Wells Fargo had Wells Capital take over management of some of the portfolios in the Program.  Exh.19 to Plaintiff's Resp., ECF No. 323-19.

By late spring 2008, Plaintiff's losses in the Program had increased significantly, by approximately $1.3 million.  Marvin Ostermiller Dep., Exh. B-9 to Def.'s Reply, ECF No. 347, at 648; April 18, 2008 Valuation Report, Exh. A-52 to Def.'s Mot. for Summ. J., ECF No. 293-11 (showing unrealized losses in the EY Fund of $1,175,025.22 and in the CI Term Fund of $751,417.07).  In May 2008, Plaintiff requested a list of securities contained in the two funds, which was provided by Wells Fargo.  Exh. A-60 to Def.'s Mot. for Summ. J., ECF No. 293-13.  Plaintiff then apparently sent the list to other investment advisors for "feedback."  Exhs. A-62 through A-66 to Def.'s Mot. for Summ. J., ECF No. 293-15 through 293-19.  Some problems were identified but none of Plaintiff's advisors warned of serious issues in the two portfolios.  *Id.*  Plaintiff also began evaluating whether to continue in the

17

Wells Fargo Program or to seek alternatives.  Exh. A-99 to Def.'s Mot. for Summ. J., ECF No. 293-30.  Plaintiff began discussions with Wells Fargo about options for how to exit the Program in July 2008.  Exh. A-70 to Def.'s Mot. for Summ. J., ECF No. 293-50.  In a letter dated September 18, 2008, Plaintiff informed Wells Fargo of its desire to exit the Program and requested to be informed of the exact amount of the cash deficiency needed to terminate all the securities lending agreements, and requested that Wells Fargo commence creating a segregated account for Plaintiff's portion of the Trust securities.  Exh. A-72 to Def.'s Mot. for Summ. J., ECF No. 293-52.

On or around September 19, 2008, Wells Fargo notified participants in the Program that the Trust series would be disaggregated into separate client accounts, in other words, each client would receive a "a pro-rata portion of each asset held in any collateral account in which the client participates."  Exh. A-30 to Def.'s Mot. for Summ J., ECF No. 294-22.  Plaintiff contends that one problem with this is that its pro rata share of many  assets were too small to sell and therefore could not be liquidated.  Affidavit of Steven Wagner, Exh. 2 to Plaintiff's Resp., ECF No. 323-2, ¶ 17.

Plaintiff's efforts to exit the Program continued in October 2008.  In an internal memo dated October 28, 2008, Marv Ostermiller, Plaintiff's CFO, explains the options: (1) continue in the Program; (2) a staged wind down, whereby Plaintiff would on a monthly basis determine how many holdings could be returned without creating liquidity problems; (3) a buyout of the Program by replacing the illiquid investments with cash in the amount of $45 million; or (4) some combination of the wind down and buyout.  Exh. B-2 to Def.'s

Mot. for Summ J., ECF No. 294-70[11].  On October 29, 2008, Plaintiff notified Wells Fargo

that it would engage in the "staged wind down" exit from the Program.  Exh. A-32 to Def.'s

Mot. for Summ J., ECF No. 294-24.  That strategy was implemented; Plaintiff does not

allege any claims based on Wells Fargo's actions in winding down Plaintiff's participation

in the Program.  Through this strategy and general market improvement, Plaintiff's

unrealized losses in the Trust investments began to decrease in 2009 and as of May 2010

were around $4.6 million.[12]  Marvin Ostermiller Dep., Exh. A-25 to Def.'s Mot. for Summ J.,

ECF No. 294-19, 89; Exh. A-52 to Def.'s Mot. for Summ. J., ECF No. 293-11.

Plaintiff's Amended Complaint (ECF No. 49) contains the following claims for relief:

(1) replevin, seeking return of the loaned securities; (2) breach of contract; (3) breach of

fiduciary duty; (4) fraud based on misrepresentation and non-disclosure/concealment; (5)

negligent misrepresentation; (6) conversion; (7) unjust enrichment; (8) violation of the

Colorado Securities Act; and (9) accounting.  Wells Fargo seeks summary judgment in its

favor on all claims.  Plaintiff seeks partial summary judgment in its favor on its breach of

fiduciary duty claim.

<u>Standard of Review</u>

Summary judgment is appropriate when there is no genuine issue as to any material

fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  A

---

[11]According to account statements, Plaintiff's total realized and unrealized losses in the collateral investments were $7.2 million as of October 31, 2008 and $8 million by November 30, 2008.  Exh. A-52 to Def.'s Mot. for Summ. J., ECF No. 293-11.

[12]It is unclear what is the current status of Plaintiff's investments in the funds, but the Final Pretrial Order, ECF No. 334, docketed September 16, 2010, suggests that Plaintiff is still in the Program.

factual issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Where "the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying 'a lack of evidence for the nonmovant on an essential element of the nonmovant's claim.'" *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998)). Then, "[t]o avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case." *Id.*

Discussion

A.   Defendant's Motion for Summary Judgment

Defendant moves for summary judgment on several grounds: (1) the Declaration limits Defendant's liability; (2) Plaintiff cannot prove willful or intentional conduct; (3) Plaintiff's non-contract claims are barred by the economic loss/independent duty rule; (4) Plaintiff's claims are barred by the holder doctrine, lack of loss causation, and lack of standing; (5) Plaintiff's breach of fiduciary duty claim is barred by contract and because there is no fiduciary relationship between the parties; (6) Plaintiff's fraud claims fail because Plaintiff did not rely on any representations made by Wells Fargo, Wells Fargo made no actionable representations, and the negligent misrepresentation claim fails because there was no business transaction involving a third party; (7) Plaintiff's replevin and conversion claims fail because Plaintiff has no right of possession; (8) Plaintiff's state law securities claim fails because Wells Fargo was not a seller of securities and Plaintiff was not a purchaser; and (9) Plaintiff's unjust enrichment and accounting claims fail because Wells

20

Fargo did not receive a benefit and accounting is a remedy, not a separate claim.

I first examine which law should apply to the dispute.  The Declaration states that it is to be governed by the Maryland Business Trust Act and other applicable laws of the state of Maryland.  Declaration, Exh. A-1 to Def.'s Mot. for Summ. J., ECF No. 294-1, Sec. 9.6.  The SLA states that it is to be governed by the laws of the state of Minnesota.  SLA, Exh. A-2 to Def.'s Mot. for Summ. J., ECF No. 294-2, Sec. 12.  The transactions were conducted between Plaintiff's personnel in Colorado and Wells Fargo's personnel in Minnesota.  The Program was administered in Minnesota and investment decisions were made there.  Wells Fargo argues that in general Minnesota law should apply.  Plaintiff appears to agree since it cites primarily Minnesota law in its response brief.

In a diversity action such as this, I apply the substantive law of the forum state, including its choice of law rules.  *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).  In general, Colorado follows the "most significant relationship" approach for both tort and contract actions in determining which law to apply.  *Hoiles v. Alioto*, 461 F.3d 1224 (10th Cir. 2006).  To determine which state has the most significant relationship I consider following factors:

> (a) the needs of the interstate and international systems,
> (b) the relevant policies of the forum,
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
> (d) the protection of justified expectations,
> (e) the basic policies underlying the particular field of law,
> (f) certainty, predictability and uniformity of result, and
> (g) ease in the determination and application of the law to be applied.

*Id.* (citations omitted).  In evaluating these factors, I may consider "the place of contracting;

the place of negotiation of the contract; the place of performance; the location of the subject matter of the contract; and the domicile, residence, nationality, place of incorporation, and place of business of the parties." *Id.* (citations omitted).  It appears that choice of law will not significantly affect the outcome of the dispute, since the parties have not identified any conflict between the law of the states that would be dispositive.  Given the parties' apparent consent and the choice of law provision in the SLA, the fact that the subject matter of the contracts were primarily administered in Minnesota, and the investment decisions were made in Minnesota, I will analyze the claims (excluding the Colorado statutory claim) under Minnesota law.

    1.   <u>Contractual Limitations of Liability</u>

Wells Fargo argues that, despite the existence of numerous documents and contracts governing the parties' relationship, the provisions in the Declaration of Trust are paramount and limit its liability.  It points to two provisions in the Declaration that it claims relieve it of liability for all but certain claims and types of conduct, specifically Sections 8.1 and 8.4.

Section 8.4 provides:

> To the extent that, at law or equity, a Covered Person has duties (including fiduciary duties) and liabilities relating to the Trust or any Series thereof or to any Shareholder, any such Covered Person acting under this Declaration shall not be liable to the Trust or any Series thereof or to any Shareholder for the Covered Person's good faith reliance on the provisions of this Declaration.  The provisions of this Declaration, to the extent that they restrict or limit the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the parties hereto to replace such other duties and liabilities of such Covered Person.

Declaration, Exh. A-1 to Def.'s Mot. for Summ J., ECF No. 294-1.  Wells Fargo argues that

this means Plaintiff's non-contract claims are barred.

Section 8.1, set forth in full above, provides that the Trustee and others shall not be liable "by reason of any act performed or omitted by such Covered Person in good faith on behalf of the Trust . . . and in a manner reasonably believed to be within the scope of authority conferred on such Covered Person by this Declaration" except that a covered person may be liable for losses or damages caused by that person's "bad faith, gross negligence, willful misconduct, or reckless disregard of the duties involved in the conduct of his or her office."  Declaration, Exh. A-1 to Def.'s Mot. for Summ J., ECF No. 294-1.  The Declaration contains a similar limitation for "errors of judgment or mistakes of fact or law." *Id.*, Sec. 9.2.  Wells Fargo argues that this means the it can only be liable for conduct that amounts to bad faith or gross negligence, and that Plaintiff cannot prove that Wells Fargo engaged in any conduct meeting that threshold.

In response, however, Plaintiff points out that there are other agreements relevant to the parties' relationship that contain different standards for the Trustee's conduct. Plaintiff further argues that ambiguity in the Declaration's provisions means that the interpretation of these clauses, alone or in combination with the other agreements, is an issue of fact for the jury and not appropriate for summary judgment.  I agree with Plaintiff.

"[T]he primary goal of contract interpretation is to determine and enforce the intent of the parties." *Motorsports Racing Plus, Inc. v. Arctic Cat Sales, Inc.*, 666 N.W.2d 320, 323 (Minn. 2003).  "When interpreting a contract, we must determine if the language is clear and unambiguous, meaning it has only one reasonable interpretation."  *Halla Nursery, Inc. v. City of Chanhassen*, 781 N.W.2d 880, 884 (Minn. 2010) (citation omitted).   In determining whether there is ambiguity I examine the meaning of the words and phrases

23

in accordance with the apparent purpose of the contract as a whole.  *Id.*  If the contract is unambiguous, I must give effect to the language of the contract.  *Id*.  I must construe a contract in such a manner as to give effect to all its terms and in the context of the full agreement.  *Metropolitan Airports Comm'n v. Noble*, 763 N.W.2d 639, 645 (Minn. 2009); *Porch v. Gen. Motors Acceptance Corp.*, 642 N.W.2d 473, 477 (Minn. App. 2002). Determination of whether a contract is ambiguous and, if unambiguous, determination of its meaning, are legal questions.  *301 Clifton Place L.L.C. v. 301 Clifton Place Condo. Ass'n*, 783 N.W.2d 551, 564 (Minn. App. 2010).  However, if I conclude the agreement or any term is ambiguous, its meaning is a question of fact for the jury or other fact-finder.  *Id.* at 565.

I first examine the effect of Section 8.4.  I agree with Plaintiff that this provision does not unambiguously eliminate all non-contractual duties.  Rather, it replaces common law duties with contractual duties where two circumstances apply: (1) the covered person has relied in good faith on a specific provision of the Declaration in taking some action and (2) that provision conflicts with a common law duty.  As noted by Plaintiff, Wells Fargo does not identify any specific provision it purports to have acted in compliance with in good faith or how that provision conflicts with a common law duty.  Accordingly, Wells Fargo is not entitled to summary judgment on the non-contract claims on the basis of Section 8.4 of the Declaration.

I next turn to the meaning and effect of Section 8.1.  I agree with Plaintiff that Section 8.1 cannot be viewed in isolation, since the Securities Lending Program and the investment of Plaintiff's collateral were governed by numerous other documents, including the SLA, the Subscription Agreement, and the Confidential Memoranda, not just the

24

Declaration. *Knut. Co. v. Knutson Constr. Co.*, 433 N.W.2d 149, 151 (Minn. App. 1988) ("A contract and several writings relating to the same transaction must be construed with reference to each other.").  The other documents provide a lesser standard for liability. Under the SLA, Wells Fargo "assumes the risk of loss arising from <u>negligent</u> and fraudulent operation of its Securities Lending Program." SLA, ¶ 8 (emphasis added) (also providing that Plaintiff assumes the risks of "collateral deficiencies or collateral investment loss"). Similarly, in other documents, Wells Fargo assumed responsibility for negligent conduct. See Confidential Memorandum for the EY Series, Exh. A-4 to Def.'s Mot. for Summ J., ECF No. 294-4 ("Wells Fargo . . . shall have no liability to the Trust or the Shareholders for any act or omission, provided that such act or omission does not involve bad faith, willful misconduct, <u>negligence</u> or reckless disregard of its duties to the Trustee") (emphasis added).

Considering the documents together, I conclude there is an ambiguity in the conflict between the "gross negligence" standard of the Declaration and the simple negligence standard of the SLA and other documents.  Resolution of the interplay among these various provisions, and whether any should be given primacy, should be done by a fact-finder.  In addition, I note that the Declaration's limitation of liability applies first to "any act performed or omitted by such Covered Person in good faith on behalf of the Trust . . . and in a manner reasonably believed to be within the scope of authority conferred on such Covered Person by this Declaration."  There is at a minimum a factual question as to whether that description would include the alleged negligent investment of the collateral in risky securities when such conduct is expressly in conflict with the investment objective set forth in the SLA; there is nothing in the Declaration to indicate that covered persons had the

authority to violate their own investment standards.  Moreover, the second provision of the limitation (providing that a covered person "shall be liable for any loss, damage or claim incurred by reason of such Covered Person's bad faith, gross negligence, willful misconduct or reckless disregard of the duties involved in the conduct of his or her office") could be read as a non-exclusive, rather than exclusive, description, of the type of conduct that will give rise to liability.  In that case, there would be no conflict with the negligence standards set forth in the other documents.

The conflict may also be resolved by concluding that while the Declaration governed the Trustee's general duties, the SLA more specifically governed the Trustee's obligations with respect to the collateral and investment of collateral.  The SLA was the primary agreement whereby Plaintiff granted Wells Fargo authorization to lend its securities and to collect and invest the collateral for those securities.  The SLA, not the Declaration, contains the obligations of the Trustee with respect to how the collateral should be invested.  Specifically, the Declaration provides only that Trust property be invested "consistent with the investment objectives established by the Trustee," whereas the SLA contains the actual standard ("The prime considerations for the investment portfolio shall be safety of principal and liquidity requirements.").  Moreover, the SLA was signed after the Declaration.  Therefore, a reasonable jury could conclude that the SLA, not the Declaration, is applicable to the dispute here.

Wells Fargo contends that the negligence standard of the SLA does not apply because it imposes liability on Wells Fargo only with respect to the "operation" of the Securities Lending Program, which does not include the investment of the collateral.  It further argues that Plaintiff undertook the risk of "collateral deficiency or collateral

26

investment loss" pursuant to the SLA, and therefore any claims based on collateral investment losses are contractually released.  I conclude that in this context "operation" is ambiguous and there is an issue of fact whether "collateral investment loss" includes the risk of Wells Fargo investing collateral in securities that did not meet the criteria set forth in the SLA.  Therefore, I will deny summary judgment on the question of whether Wells Fargo is only liable if its conduct amounts to gross negligence or bad faith.

      2.   <u>Breach of Contract Claims</u>

Wells Fargo's second argument is that Plaintiff cannot show that the investment of the collateral and other actions amounted to gross negligence.  As discussed above, I disagree that, as a matter of law, Wells Fargo is only liable if it acted in bad faith or with gross negligence.  Therefore, I examine only whether the evidence demonstrates a genuine issue of fact as to whether Wells Fargo could have breached its contractual obligations without this heightened standard.  Wells Fargo categorizes Plaintiff's contract claims into three categories: (1)  claims relating to the investment of the collateral; (2) claims relating to Plaintiff's attempted exit from the Program and the conditions which it had to meet; and (3) claims relating to the calculation of the NAV and the failure to disclose the actual NAV on a daily basis.  I will use these categories to review Wells Fargo's arguments.

Wells Fargo first argues that the collateral investments were all authorized by the investment guidelines because the Trustee was authorized to purchase "mortgage backed securities," "asset-backed securities," and "debt obligations."  It argues that the securities issued by Lehman, Cheyne, and Stanfield were debt obligations and therefore authorized. However, if these investments, while meeting the letter of the guidelines, did not comply with the "prime considerations" of "safety of principal and liquidity requirements" they would

27

nonetheless be out of compliance with the SLA and could amount to a breach of that agreement.

Wells Fargo also argues that Plaintiff cannot show that the decision to hold Lehman securities was grossly negligent.  Even if gross negligence were the standard, which is not yet determined, Plaintiff has evidence that Wells Capital divested its conservative portfolios of Lehman holdings before incurring large losses and that Wells Capital warned of problems with Lehman.  A reasonable jury could find that the Trustee had adequate notice of the risks of continuing to hold Lehman securities but nonetheless recklessly disregarded those risks.  Wells Fargo makes the same argument with respect to the SIVs; again, however, given that Wells Capital gave advance warning about the risks of SIVs and divested these from its portfolios, there is at least an issue of fact regarding whether Wells Fargo breached its obligations under the SLA and other agreements.  Plaintiff has provided evidence that these securities could have been sold at or near par, and doing so would have reduced the loss incurred by Plaintiff and other Trust participants.

With respect to Plaintiff's exit from the Trust and the Program.  Plaintiff contends that Wells Fargo breached the agreements by refusing to return the loaned securities unless Plaintiff paid the collateral shortfall, by failing to redeem the Trust shares for cash, and by requiring Plaintiff to accept a segregated account holding the collateral investments during the wind down.  Wells Fargo argues that actions were either expressly permitted by the contracts or were within Wells Fargo's broad discretion to manage the Trust.

I will not grant summary judgment to Wells Fargo on the contract claims concerning Plaintiff's attempts to exit the Program.  Again, there are ambiguities in the relevant documents.   While the SLA provides that Plaintiff assumes the risk of collateral

deficiencies, it also provides that Wells Fargo will be responsible for returning the collateral to the borrowers, which could arguably create an ambiguity about whether the shortfall had to be made up before or after the loaned securities were returned.  Similarly, with respect to redemption of Trust shares, Section 5.2 of the Declaration gave the Trustee discretion to redeem Trust shares in cash or securities, whereas the Confidential Memoranda for the two Funds provide that redemption would be in cash.  Again, resolving the conflict between these terms is an issue of fact and so summary judgment is not appropriate.  Finally, disaggregating the collateral investments into pro rata accounts in which some portions were too small to be sold may violate the contractual requirements of liquidity in the investments.

The third set of contract claims relate to the calculation of the NAV.  Wells Fargo argues that Plaintiff cannot demonstrate any losses as a result of any alleged failures in this regard.  Plaintiff does not respond to this argument in its Response Brief.  Because Plaintiff has the burden of proof with respect to loss causation, its failure to provide evidence to demonstrate a genuine issue of fact as to this element is fatal to the claim.  Accordingly, I will grant Wells Fargo's motion to the extent Plaintiff's contract claims are based on deficiencies in the calculation and disclosure of the NAV.

3. Economic Loss Rule

Wells Fargo seeks summary judgment on Plaintiff's tort claims to the extent they are duplicative of the contract claims and therefore barred by the independent duty or economic loss rule.  Minnesota recognizes this doctrine, which provides generally that a plaintiff "is not entitled to recover tort damages for a breach of contract, absent an 'exceptional case' where the breach of contract 'constitutes or is accompanied by an

independent tort.'" *Cherne Contracting Corp. v. Wausau Ins. Co.*, 572 N.W. 2d 339, 343 (Minn. App. 1997).  Wells Fargo argues that all of its duties to Plaintiff arise in contract and therefore there are no independent duties that would support a tort claim.

In response, Plaintiff argues that the breach of fiduciary duty claim is not barred because although the fiduciary relationship was created by contract, the duties of a fiduciary, including a duty of loyalty, care, and disclosure, are imposed by law and not by contract.  Plaintiff argues that these duties differ from the specific contract duties contained in the relevant agreements here.  I agree.  First, Minnesota law imposes fiduciary duties on agents and trustees.  *A. Gay Jenson Farms Co. v. Cargill, Inc.*, 309 N.W.2d 285, 290 (Minn. 1981) (agency is a fiduciary relationship); *Thomas B. Olson & Assocs., P.A. v. Leffert, Jay & Polglaze, P.A.*, 756 N.W.2d 907, 914 (Minn. App. 2008) (trustee-beneficiary is a *per se* fiduciary relationship).  Therefore, it had duties imposed by law.  *Commercial Assocs., Inc. v. Work Connection, Inc.*, 712 N.W.2d 772, 779 (Minn. App. 2006) ("Minnesota law imposes on a fiduciary the highest obligation of good faith, loyalty, fidelity, fair dealing, and full disclosure of material matters affecting the client's interests.").  I also agree with Plaintiff that there are issues of fact whether Wells Fargo breached duties that were beyond and independent of its contractual obligations.

While some of the factual averments underlying the breach of fiduciary claim in the Amended Complaint are duplicative of the contract claims, and therefore may be barred, several others imply obligations arising outside of contract.  These include the failure to warn Plaintiff about the risks and declines in the portfolio, representing the NAV as $10/share when in fact it was lower, recommending that Plaintiff remain in the Program after November 2007 when other clients had made redemptions causing a shortfall in the

30

collateral investments, failing to disclose those shortfalls, permitting some clients to exit the Program on better terms than Plaintiff, segregating the accounts into pro rata shares of the underlying investments (which if permitted by contract could nonetheless have been a violation of fiduciary duties), and otherwise failing to disclose material information about the Program and collateral investments.   While Wells Fargo may have complied with its contractual duties with respect to disclosure of the portfolio securities and their status, as a fiduciary it may have had a heightened obligation to disclose information about the losses and the reasons for the losses, the actual NAV, and Wells Fargo's knowledge regarding the risks of the SIVs and Lehman.   Similarly, while the Declaration granted the Trustee discretion in a variety of matters, and so its actions may have been within the scope of its discretion as set forth by contract, as a fiduciary that discretion may have been limited by its duties of loyalty and care.   Accordingly, the independent duty rule does not entitle Wells Fargo to summary judgment on the breach of fiduciary duty claim.   However, to the extent that the claim is based on contractual duties, Plaintiff will not be permitted to obtain duplicative relief.

Similarly, Plaintiff has established facts that could demonstrate fraud, either by misrepresentation or nondisclosure, based on duties outside of the contracts.   Again, while some of the averments in the Amended Complaint concern contractual duties, such as the obligation to invest the collateral in safe, liquid securities, which may be barred by the independent duty rule, not all bases of the fraud claim arise from contract.   The claim is also based on representations and omissions of Wells Fargo in inducing Plaintiff to stay in the Program in November 2007.   Plaintiff has presented evidence that Wells Fargo represented that the problems were the result of short-term liquidity issues that would be

resolved in a few months, when there is evidence to indicate that the problems were more structural than what was disclosed and that Wells Fargo had significant concerns about the viability of the Program and its investments.  Again, these matters may fall outside of the obligations of the SLA or other contracts between the parties.  Accordingly, summary judgment based on the independent duty rule is not appropriate.

       4.    <u>Holder Doctrine, Loss Causation, Standing</u>

Wells Fargo argues that Plaintiff's fraud and misrepresentation claims are also barred by the "holder" doctrine, which applies in "an action in which the plaintiffs allege that material misrepresentations or omissions caused them to retain ownership of securities that they acquired prior to the alleged wrongdoing." *In re WorldCom, Inc. Secs. Litig.*, 336 F.Supp.2d 310, 318-19 (S.D.N.Y. 2004).  Such claims are not recognizable under the federal securities law because of the inherently speculative nature of proving reliance and damages, in that the claim would rely largely on a plaintiff's "oral version of a series of occurrences." *Id.* (quoting *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 742 (1975)); *Loop Corp. v. McIlroy*, No. A04-362, 2004 WL 2221619 at *5 (Minn. App., Oct. 5, 2004) (noting that Minnesota does not recognize a common law cause of action for stockholders claiming they were induced to continue holding their stock).

I agree with Plaintiff that the policy concerns underlying the holder doctrine appear to be inapplicable here.  Unlike owners of common stock, Plaintiff could not buy or sell its shares of the Trust on an open market at will.  Declaration, Sec. 4.9 ("The beneficial interest in the Trust of a Shareholder shall not be transferable and any purported transfer shall be void and of no effect.").  It could only redeem its shares with the Trust, rendering questions of whether it would have sold its shares far less speculative.  Similarly, unlike

securities cases involving publicly traded shares, there was direct communication and representations between the shareholder and the persons allegedly making the misrepresentations and other inducements.  This means that the evidence is not simply a speculative, retrospective analysis of what a shareholder "would have done."  Rather, the evidence here could persuade a reasonable jury that Plaintiff attempted to exit the Trust at a specific time, in November 2007, and was dissuaded from doing so by Wells Fargo's affirmative representations and in the absence of the complete information it needed to make its decision.

I also conclude that the issue of loss causation is not speculative; given the fixed point at which Plaintiff may have sought to obtain the return of its loaned securities, determining the losses thereafter is not an exercise in guesswork.

Wells Fargo also argues that Plaintiff cannot prove loss causation because the alleged omissions or misrepresentations "did not cause Cheyne, Stanfield Victoria, or Lehman to default."  Def.'s Mot. for Summ. J., ECF No. 293, at 46.  This is not Plaintiff's burden - Plaintiff need only show that it suffered some loss as a result of Wells Fargo's alleged improper conduct.  Plaintiff has presented evidence that it was induced to join, stay in, and to expand its participation in the Program based on the representations of Wells Fargo concerning the types of investments selected for the collateral and the general health of the portfolio.  If credited, such evidence would establish a causal connection.

Wells Fargo also contends that Plaintiff's claims are derivative of the Trust.  Again, there are issues of fact that preclude summary judgment on this basis.  Given that the investment assets were disaggregated and Plaintiff's injuries are at least in part due to the actions of Wells Fargo as Plaintiff's agent, I cannot conclude as a matter of law that

Plaintiff's claims are solely derivative.

Finally, Wells Fargo contends that the fraud claims are barred by the Subscription Agreement, which states that Plaintiff did not rely on any representations and was making the investments based on its own investigation and knowledge.  However, as noted by Plaintiff, the disclaimer refers to representations made in the Subscription Agreement, the Confidential Memorandum, and any other documents furnished by Wells Fargo.  Since the claims are based in part on representations made in documents furnished by Wells Fargo, as well as statements made after the Subscription Agreement was signed in April 2006, the Subscription Agreement does not bar the claims.

     5.    <u>Existence and Breach of Fiduciary Duty</u>

Wells Fargo argues that there is no fiduciary relationship and that, even if there were, the contractual limitations of liability release breach of fiduciary duty claims.  As discussed above, the contracts are ambiguous and/or arguably do not release these claims.  Further, there is sufficient evidence from which a jury could conclude that Wells Fargo was a fiduciary to Plaintiff and other Program participants.  First, Wells Fargo was Plaintiff's agent pursuant to the SLA; as discussed above, agents have fiduciary duties imposed by law.  Moreover, several of Wells Fargo's representatives have admitted in their depositions that Wells Fargo was in a fiduciary position as Trustee, investment manager, and custodian of the securities of the Program's participants.  Michael Hogan Dep., Exh. 3 to Plaintiff's Resp., ECF No. 323-3, at 132; Roger Adams Dep., Exh. 23 to Plaintiff's Resp., ECF No. 323-23, at 129.  There is sufficient evidence on this issue to go to a jury and so summary judgment is not appropriate.

     6.    <u>Fraud Claim - Reliance</u>

Wells Fargo's next argument is that the fraud claims fail because Plaintiff cannot show reasonable and justifiable reliance on Wells Fargo's false representations.  Wells Fargo argues that Plaintiff is a "sophisticated investor" and was adequately advised of the risks of the programs.  Wells Fargo further argues that the claims are not based on statements of past or present fact, but rather concern vague or indefinite statements or statement of opinion or predictions of future events.  Wells Fargo claims that there were sufficient disclaimers and cautionary statements to put a reasonable investor on notice of the possibility of losses.  Finally, Wells Fargo contends that the negligent misrepresentation claim fails because there is no evidence that Plaintiff was mislead in connection with a transaction with a third party.

Again, I find Wells Fargo's arguments unavailing.  Plaintiff's sophistication is an issue of fact.  Although it had significant investments, there is evidence that it relied on third party investment advisors and on Wells Fargo's expertise with respect to the Program. Moreover, the reasonableness of reliance on statements or lack of information is generally not an appropriate subject for summary judgment, as it presents a classic issue of fact. *Hoyt Props., Inc. v. Prod. Res. Grp., L.L.C.*, 716 N.W.2d 366, 374 (Minn. App. 2006) ("Reliance is generally a question of fact.").  There are also factual disputes regarding whether Wells Fargo accurately depicted the problems and causes of the losses in the portfolios in November 2007 and whether it had obligations to disclose more.  These concern statements regarding present and past fact, not solely statements of opinion or predictions.  The effect of the generic cautionary statements when combined with the specific representations about how the collateral would be invested and the state of the portfolio at various key points should be resolved by a jury.

I turn to the argument concerning Plaintiff's negligent misrepresentation claim. Under Minnesota law, "a person makes a negligent misrepresentation when (1) in the course of his or her business, profession, or employment, or in a transaction in which he or she has a pecuniary interest, (2) the person supplies false information for the guidance of others in their business transactions, (3) another justifiably relies on the information, and (4) the person making the representation has failed to exercise reasonable care in obtaining or communicating the information." *Valspar Refinish, Inc. v. Gaylord's, Inc.*, 764 N.W.2d 359, 369 (Minn. 2009) (citation omitted, noting that Minnesota relies on Restatement (Second) of Torts § 552).   Wells Fargo notes that as formulated in the Restatement, an essential element of this tort is that the transaction at issue be between the plaintiff and a third party, not the defendant.  Therefore, Wells Fargo argues, because Plaintiff has no evidence that Wells Fargo's statements affected Plaintiff's business transactions with any other party, this claim must fail.[13]

Plaintiff argues that Minnesota courts have not expressly adopted this element of the Restatement and that under the relevant case law, it has adequately alleged a "business transaction."  I need not resolve the question of whether Minnesota law would require a third party transaction because I conclude that even if this element were required, Plaintiff has adequate evidence to go forward.  The representations and omissions here involve the securities lending program, which arguably involves a third party, that is, the borrowers of Plaintiff's securities.  Accordingly, summary judgment is not appropriate.

---

[13]Wells Fargo also argues that a negligent misrepresentation claim fails under Minnesota law when the parties are engaged in an arms' length transaction.  Since I have already determined that there is sufficient evidence to find a fiduciary relationship, I need not consider this argument.

7.    Replevin and Conversion Claims - Right of Possession

Plaintiff's first and sixth claims, replevin and conversion, are based on Plaintiff's allegation that Wells Fargo "has, without lawful justification, willfully interfered with and deprived [Plaintiff] of the use and possession of their interest in [Plaintiff's] securities." Amended Complaint, ECF No. 18, ¶ 212.  Wells Fargo argues that these claims are barred by the independent duty rule and further, that the claims fail because Plaintiff's ownership rights are qualified by the contracts it signed, in which it agreed to transfer the right of possession to the borrowers.  Pursuant to the agreements, the collateral must be repaid to obtain the return of the loaned securities.  Plaintiff argues that the obligation to return the collateral to the borrowers belongs to Wells Fargo and that the question of who is responsible for making up any shortfall in the collateral is an issue of fact.  I agree with Wells Fargo.

Under Minnesota law, the tort of conversion requires showing that a plaintiff holds a property interest and that the defendant has deprived the plaintiff of that interest.  *Lassen v. First Bank Eden Prairie*, 514 N.W.2d 831, 838 (Minn. App.1994), review denied (Minn. June 29, 1994).  Conversion requires "the exercise of dominion and control" over property "inconsistent with, and in repudiation of, the owner's rights in those goods." *Rudnitski v. Seely*, 452 N.W.2d 664, 668 (Minn.1990).[14]

Here, Wells Fargo did not deprive Plaintiff of its property, nor does it exercise dominion and control over the property; rather, the securities are under the control of the

---

[14]Replevin differs from conversion only in terms of relief sought, in that damages are recoverable for a conversion claim whereas a replevin action seeks to regain possession of the property itself.  *Widgren v. Massie*, 352 N.W.2d 420, 424-25 (Minn. App.1984).

borrowers pursuant to the agreements signed by Plaintiff.  Neither the borrowers nor Wells Fargo have taken any action to repudiate Plaintiff's right of ownership.  Plaintiff authorized Wells Fargo to enter into lending contracts with the borrowers, and those contracts require the repayment of the collateral, and this repayment is the only barrier to the return of the property.  There is merely a dispute regarding who is responsible for the payment needed as a prerequisite for the return of the securities.

To the extent that Plaintiff is claiming that Wells Fargo is in breach of its contractual obligations by not repaying the collateral shortfall itself when Plaintiff sought to exit the Program, this is clearly a contract claim and barred by the independent duty rule. Therefore, I will grant summary judgment in favor of Wells Fargo and against Plaintiff on the conversion and replevin claims.

8.    <u>Colorado Securities Act Claim</u>

Plaintiff's eighth claim appears to be based on C.R.S. § 11-51-501, which makes it unlawful for anyone "in connection with the offer, sale, or purchase of any security, directly or indirectly, to make any untrue statement of a material fact or to omit to state a material fact."  Wells Fargo argues that this claim fails because it is not a seller of securities under the state statute and Plaintiff is not a buyer.  Rather, Wells Fargo argues that it is the Trustee, and that the seller of the securities was the Trust itself, and that it did not receive compensation for the sale of those shares.  Alternatively, Wells Fargo argues that Plaintiff was not a buyer of securities because the Trust owned the collateral securities that are the center of the dispute.  Wells Fargo also argues that any claims based on the purchase of the shares of the Trust are time barred.  I disagree and conclude there are issues of fact precluding summary judgment.

The Colorado Securities Act defines a sale of securities as "every contract of sale or, contract to sell, or disposition of a security or interest in a security for value." C.R.S. § 11-51-201(13)(a). Wells Fargo does not appear to dispute that shares of the Trust are securities. Moreover, as Plaintiff notes, Wells Fargo as sponsor of Wells Fargo Program and creator of the Trust could plausibly make Wells Fargo a "seller" of securities. The definition of "security" also includes an "investment contract," C.R.S. § 11-15-201(17), which could apply to the Program and SLA here. Similarly, there is no factual dispute that Plaintiff purchased the Trust shares, making it a buyer of securities.

Wells Fargo's argument with respect to the time-bar is that the Colorado Securities Act has a limitations period of "three years after the discovery of facts giving rise to a cause of action . . . and in no event more than five years after the purchase or sale . . . ." C.R.S. § 11-51-604(8). Wells Fargo argues that Plaintiff signed the SLA on January 1, 2001 and more than five years have elapsed, and so the claim is barred. In response, Plaintiff notes that shares of the Trust were purchased and sold on Plaintiff's behalf on a daily basis, including in 2007 and 2008. Because there are issues of fact in this regard, summary judgment based on the limitations period is not appropriate.

Wells Fargo also argues that no misrepresentations were made "in connection with" the sale of Trust shares. Plaintiff responds that the representations and omissions that induced it to stay in the Program can be considered statements made in connection with its further purchases of Trust shares. Again, given the factual issues around this question, Wells Fargo is not entitled to summary judgment on this basis. Finally, Wells Fargo argues that Plaintiff cannot establish the scienter element. However, as discussed above, Plaintiff has offered sufficient evidence to show possibly grossly negligent, reckless, or even

intentional conduct, which is sufficient at this stage of the litigation to establish the state securities law claim.

9.    Unjust Enrichment, Accounting

The seventh claim is for unjust enrichment, and is based on the notion that Wells Fargo unlawfully refused to return the securities upon Plaintiff's demand and has thereby unjustly received a benefit.  Wells Fargo argues that it did not hold or retain Plaintiff's loaned securities, as discussed above in the conversion claim, and, moreover, waived its fees during the financial crisis and so did not receive any benefit.  Wells Fargo also contends that an accounting is a remedy, not a claim in its own right.  Plaintiff did not respond to these arguments in its Response Brief.

To prevail on a claim of unjust enrichment claim, a plaintiff must show: (1) a benefit conferred by the plaintiff on the defendant; (2) the defendant's knowing acceptance of the benefit; and (3) the defendant's acceptance and retention of the benefit where it would be inequitable to retain it without paying for it.  *Acton Constr. Co. v. State*, 383 N.W.2d 416, 417 (Minn. App.1986), review denied (Minn. May 22, 1986).  It is not clear from the Amended Complaint what Plaintiff considers to have been the "benefit" conferred on Defendant.  If it is the possession of the securities, then I agree with Wells Fargo that the borrowers, not Wells Fargo, have received the benefit and there is nothing improper in their possession of the securities.  If it is the fees obtained through the Program, then I agree again with Wells Fargo that this claim fails because it is duplicative of the contract claim.

With respect to Plaintiff's request for an accounting, I need not resolve the issue of whether this is a claim or a remedy.  In the event that Plaintiff prevails at trial on claims for which an accounting is appropriate, Wells Fargo may file appropriate motions at that time.

In summary, Wells Fargo's Motion for Summary Judgment is granted with respect to Plaintiff's claim that it suffered damages as a result of Wells Fargo's failure to properly publish the NAV, to the extent that Plaintiff's tort claims rely on contract duties, and as to Plaintiff's claims for replevin, conversion and for unjust enrichment (First, Sixth, and Seventh Claims for Relief) . The motion is otherwise denied and the remaining issues shall proceed to trial.

B.   <u>Plaintiff's Motion for Partial Summary Judgment</u>

Plaintiff seeks summary judgment on its breach of fiduciary duty claim on the grounds of collateral estoppel. A previous lawsuit was filed by several participants in the Program; the case went to trial and a jury found that Wells Fargo had breached its fiduciary duty to the participants based on several of the grounds asserted by Plaintiff here.

The previous case is *Workers' Compensation Reinsurance Association v. Wells Fargo Bank, N.A.*, Case No. 62-CV-08-10825 (2d Jud. Distr., Minn.) (the "Minnesota Action"). The Minnesota Action involved four plaintiffs who invested in the Program; several of them participated in the same two Trust series as Plaintiff, the CI Term Fund and the EY Fund. Plaintiff focuses in particular on one plaintiff in the Minnesota Action, the Robins, Kaplan, Miller & Ciresi Foundation for Children ("RKMCF"), which prevailed on its breach of fiduciary duty claim against Wells Fargo. Plaintiff presents evidence that RKMCF signed the identical Securities Lending Agreement as Plaintiff here, participated in the same funds, and received the same mailings and information as Plaintiff about the funds. Like Plaintiff, RKMCF was not able to exit the Program and obtain the return of its securities without incurring significant losses and paying the shortfall in the collateral. RKMCF based its breach of fiduciary duty claim on Wells Fargo's improper investments,

41

misrepresentations and concealment of information about the nature and risks of the collateral investments, and refusal to let RKMCF exit the Program on the same terms as others had previously been allowed.  The court in the Minnesota Action determined that Wells Fargo owed all of the plaintiffs a fiduciary duty as a matter of law and, after a six week trial, a jury found that Wells Fargo had breached that duty.

In response to the motion, Wells Fargo argues that collateral estoppel is inapplicable here.  It also submits in summary fashion the various arguments that I have rejected in the discussion above.   Therefore, I focus solely on the merits of the collateral estoppel argument.

Offensive collateral estoppel is permitted under both Colorado and Minnesota law. *Antelope Co. v. Mobil Rocky Mountain, Inc.*, 51 P.3d 995, 1003 (Colo. App. 2001); *Green v. City of Coon Rapids*, 485 N.W.2d 712, 718 (Minn. App. 1992).  To prevent relitigation of an issue determined in a previous action, the proponent must demonstrate: (1) the issue is identical to those in a prior adjudication; (2) the prior adjudication resulted in a final judgment on the merits; (3) the party sought to be estopped was a party in the prior adjudication; and (4) the party sought to be estopped was given a full and fair opportunity to be heard on the issue or issues in question.  *Antelope Co.*, 51 P.3d at 1003; *Green*, 485 N.W.2d at 718.  Wells Fargo was the defendant in the Minnesota action and the matter was resolved after a full trial to the jury, which satisfies the third and fourth element of the test. I therefore examine whether the issues in this case are identical and whether the prior adjudication resulted in a final judgment.

I conclude that the evidence does not demonstrate, as a matter of law, that the issues here are identical to those resolved in the Minnesota Action with respect to the

42

breach of fiduciary duty claim.  Plaintiff's claims, including the breach of fiduciary duty claim, rest in significant part upon the representations made to Plaintiff at the November 28, 2007 meeting, which is a circumstance unique to Plaintiff and not common to the Minnesota Action plaintiffs.  The Minnesota Action plaintiffs apparently had their own communications with Wells Fargo, which may have differed in some regard from Plaintiff's. Among other issues, I see testimony that the plaintiffs in the Minnesota Action made written demands to terminate their participation in the Program, and the demands were not honored by Wells Fargo.  I see no evidence of a similar demand here; rather, it seems Plaintiff requested what would be required to exit the Program and then chose to use a staged wind-down.  There is also evidence of direct requests for information by at least one of the plaintiffs in the Minnesota Action, which again may present different facts than those here.

In addition, I cannot determine from this record what facts were relied upon and necessary to the jury's verdict.  *In re Discipline of Morris*, 408 N.W.2d 859, 862 (Minn. 1987) ("A former verdict is conclusive only as to facts directly and distinctly put in issue and the finding on which is necessary to uphold the judgment.") (citation omitted).  The Minnesota Action's jury in its verdict form only found that the duty was breached, and not what specific actions comprised the breach.  Therefore, it is unclear whether the grounds for the jury's finding are the same as those presented here.  *Parker v. MVBA Harvestore Sys.*, 491 N.W. 2d 904, 906 (Minn. App. 1992) (collateral estoppel not appropriate as to previous jury verdict where jury answered "yes" to open ended question and court could only speculate on what was actually adjudicated).  Because I cannot determine from this record as a matter of law that the issues presented in the previous case were identical to

those here, I will not grant summary judgment in Plaintiff's favor on this claim.

Accordingly, it is ordered:

1.  Wells Fargo's Motion for Summary Judgment (ECF No. 293) is granted in part and denied in part.  Summary judgment shall be granted in favor of Wells Fargo against COPIC on COPIC's claims for replevin, conversion and for unjust enrichment (First, Sixth, and Seventh Claims for Relief).  The motion is also granted with respect to Plaintiff's claim that it suffered damages as a result of Wells Fargo's failure to properly publish the NAV and to the extent that Plaintiff's tort claims rely on contract duties.  The motion is otherwise denied.

2.  Plaintiff COPIC's Motion for Partial Summary Judgment on Breach of Fiduciary Duty Claim (ECF No. 291) is denied.

3.  Wells Fargo's Motion to Strike or Disregard COPIC's Supplemental Authority (ECF No. 359) is denied.

DATED at Denver, Colorado, on February 10, 2011.

BY THE COURT:

s/ Walker D. Miller
United States Senior District Judge